# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 2467 | DATE | MARCH 25, 2004 |
| CASE TITLE | YOON JA KIM v. CONAGRA FOODS, INC., etc. | | |

**MOTION:**

[In the Following Box (A) Indicate the Party Filing the Motion, E.g., Plaintiff, Defendant, 3rd Party Plaintiff, and (B) State Briefly the Nature of the Motion Being Presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion for summary judgment [109] is denied. Plaintiff's motion for partial summary judgment [110] is granted. Defendant's affirmative defense based on the recapture rule is dismissed. In open court on May 5, 2004 at 11:00 a.m., the parties shall present an original and one copy of a final pretrial order in full compliance with Local Rule 16.1 and Local Rule Form 16.1.1.

(11) ■ [For further detail see attached Memorandum Opinion and Order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | 4 number of notices |
| ✓ | Notices mailed by judge's staff | MAR 26 date docketed |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | docketing deputy initials |
| | Mail AO 450 form. | MARCH 25, 2004 date mailed notice |
| | Copy to judge/magistrate judge. | |
| cw | courtroom deputy's initials | mqm mailing initials |

U.S. DISTRICT COURT
CLERK
2004 MAR 25 PM 4:51

Date/time received in central Clerk's Office

Document Number

120

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

MAR 2 6 2004

YOON JA KIM,                         )
                                     )
                Plaintiff,           )
                Counterdefendant,    )
                                     )
        v.                           )        No. 01 C 2467
                                     )
CONAGRA FOODS, INC., a Nebraska      )
corporation,                         )
                                     )
                Defendant,           )
                Counterclaimant.     )


## MEMORANDUM OPINION AND ORDER


Plaintiff Yoon Ja Kim is the holder of U.S. Patent No.
Re. 36,355 (the "'355 Patent"), which issued on October 26, 1999
as a reissue of U.S. Patent No. 5,510,129 (the "'129 Patent").
The '355 Patent is a patent for a potassium bromate replacer
composition.  Potassium bromate is an oxidizing agent for bread
dough, but its use became less common after it was discovered to
cause cancer in laboratory animals.  Plaintiff's composition is a
substitute for potassium bromate.  In her Amended Complaint,
plaintiff alleges that defendant ConAgra Foods, Inc. contributes
to or induces infringement of the '355 patent by licensing others
to produce certain breads under the ConAgra and Healthy Choice

120

brand name using formulas containing ascorbic acid, food acid, flour and/or other ingredients in the proportions set forth in Claims 5 and 10 of the '355 patent.[1] Presently pending is defendant's motion for summary judgment based on the '355 patent being invalid as violative of the recapture rule. Plaintiff cross moves for partial summary judgment dismissing the recapture defense.

On a motion for summary judgment,[2] the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002); Hilt-Dyson v. City Of Chicago, 282 F.3d 456, 462 (7th Cir.), cert. denied, 537 U.S. 820 (2002); Schneiker v. Fortis Insurance Co., 200 F.3d 1055, 1057 (7th Cir. 2000); Augustine Medical, Inc. v. Progressive Dynamics, Inc., 194 F.3d 1367, 1370 (Fed. Cir. 1999). The burden of establishing a lack of any genuine issue of material fact rests on the movant. Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001); Vivid

---

[1] The '355 patent and plaintiff's allegations are described in greater detail in this court's ruling on defendant's prior motion for summary judgment in which defendant raised other invalidity defenses and whether the accused products infringe the '355 patent. See Kim v. ConAgra Foods, Inc., 2003 WL 21222266 (N.D. Ill. May 23, 2003) ("ConAgra II"). Plaintiff also relies on Claims 6, 7, and 8 of the '355 patent, but those Claims need not be separately considered since they are dependent on Claim 5.

[2] In this patent case which is appealable to the Federal Circuit, Seventh Circuit law applies to procedural summary judgment issues. See Arthur A. Collins, Inc. v. Northern Telecom Ltd., 216 F.3d 1042, 1047-48 (Fed. Cir. 2000); Vivid Technologies, Inc. v. American Science & Engineering, Inc., 200 F.3d 795, 807 (Fed. Cir. 1999).

Technologies, Inc. v. American Science & Engineering, Inc., 200 F.3d 795, 806-07 (Fed. Cir. 1999); Wollin v. Gondert, 192 F.3d 616, 621-22 (7th Cir. 1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which she will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Billings v. Madison Metropolitan School District, 259 F.3d 807, 812 (7th Cir. 2001). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. Celotex, 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. See NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 236 (7th Cir.), cert. denied, 515 U.S. 1104 (1995); Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc., 984 F.2d 1182, 1191 (Fed. Cir. 1993); Covalt v. Carey Canada, Inc., 950 F.2d 481, 485 (7th Cir. 1991); Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 476-77 (7th Cir.), cert. denied, 488 U.S. 852 (1988).

Section 251 provides in part:

> Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Director shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

35 U.S.C. § 251. Section 251 incorporates the recapture rule which has been summarized as "prevent[ing] a patentee from regaining through reissue the subject matter that he surrendered in an effort to obtain allowance of the original claims." Pannu v. Storz Instruments, Inc. 258 F.3d 1366, 1370-71 (Fed. Cir. 2001) (quoting In re Clement, 131 F.3d 1464, 1468 (Fed. Cir. 1997)).

The issue raised in the pending motions is whether, during the prosecution of the application for the '129 patent, plaintiff "surrendered" reissued Claims 5 and 10 of the '355 patent and therefore should not have been permitted to include them in the reissued '355 patent. "Surrender" must be understood in the context of the recapture rule as incorporated in § 251. The act of surrender is a deliberate act, Hester Industries, Inc. v. Stein, Inc., 142 F.3d 1472, 1484 (Fed. Cir.), cert. denied, 525 U.S. 947 (1998); Clement, 131 F.3d at 1468; Mentor Corp. v. Coloplast, Inc., 998 F.2d 992, 995-96 (Fed. Cir. 1993); Ball Corp. v. United States, 729 F.2d 1429, 1435-36 (Fed. Cir. 1984); Haliczer v. United States, 356 F.2d 541, 545 (Ct. Cl. 1966); Datascope Corp. v. Arrow International, Inc., 2001 WL 1045524 *9 (D.N.J. Aug. 17, 2001); Minuteman International, Inc. v. Critical-Vac Filtration Corp., 1997 WL 370204 *6 (N.D. Ill. June 27, 1997), aff'd by unpublished order, 152 F.3d 947 (Fed. Cir. 1998); California Medical Products, Inc. v. Tecnol Medical Products, Inc., 921 F. Supp. 1219, 1248 (D. Del. 1995), sometimes described as an act that essentially is an admission that the pertinent patent claim is not patentable. Hester, 142

- 4 -

F.3d at 1481; Clement, 131 F.3d at 1469; Mentor, 998 F.2d at 995;
Seattle Box Co. v. Industrial Crating & Packing, Inc., 731 F.2d
818, 826 (Fed. Cir. 1984); Datascope, 2001 WL 1045524 at *6.
Surrender is an intentional act. Clement, 131 F.3d at 1469;
Ball, 729 F.2d at 1435-36; California Medical, 921 F. Supp.
at 1248. The statute uses the term "error." In order to qualify
for reissue, the pertinent omission from the originally issued
patent must have resulted from error. In contrast with
surrender, which must be deliberate and intentional, "error" has
been construed as being synonymous with the prior statutory
language of "inadvertence, accident, or mistake." In re Doyle,
293 F.3d 1355, 1359 (Fed. Cir. 2002); Hewlett-Packard Co. v.
Bausch & Lomb, Inc., 882 F.2d 1556, 1565 (Fed. Cir. 1989), cert.
denied, 493 U.S. 1076 (1990); Ball, 729 F.2d at 1435 & n.9.
While deliberately cancelling or amending a claim will ordinarily
constitute surrender, other evidence may show it was not an
intentional relinquishment of the subject matter. Clement,
131 F.3d at 1469.

Plaintiff's original patent prosecution included claims
that did not have phosphate as an ingredient. No such claims
were included in the '129 patent as issued. Claims without
phosphate, including Claims 5 and 10 which are at issue, were
included in the reissued '355 patent. Claims 5 and 10 also
contain broader ranges of food acid than the claims contained in
the '129 patent as issued. The question in dispute is whether
the non-phosphate Claims and broader food-acid ranges omitted

from the '129 patent as issued were omitted due to "error" or were omitted because plaintiff "surrendered" them.

Defendant contends that the intent element of surrender does not go to plaintiff's actual subjective intent. For this proposition, plaintiff relies on Scripps Clinic & Research Foundation v. Genentech, Inc., 927 F.2d 1565, 1575 (Fed. Cir. 1991), and the cases cited therein. See In re Weiler, 790 F.2d 1576, 1581 (Fed. Cir. 1986); In re Rowand, 526 F.2d 558, 560 (C.C.P.A. 1975). Those cases, however, concern the "intent to claim," which goes to the question of whether the reissue claim was or could have been included in the original patent application and therefore does not introduce new matter, which is prohibited by § 251. Those cases support the proposition that the reissue applicant does not have to show[3] the applicant's subjective intent to have included the reissue claims in the original patent, nor is the reissue applicant necessarily required to even show an objective intent to claim. See In re Amos, 953 F.2d 613, 617-19 (Fed. Cir. 1991). See also Hester, 142 F.3d at 1484-85. The intent to have included subject matter in the original application is different from any intent to remove (surrender) subject matter during the process of having a patent issue. Cf. Weiler, 790 F.2d at 1582 (distinguishing objective intent to claim aspect of error from deceptive intent aspect which is subjective).

---

[3]Unlike the present case, Weiler and Rowand both involved appeals from the Patent Office's rejection of reissue applications and thus the burden of proof remained on the applicants.

This does not mean that objective evidence of intent is irrelevant. The prosecution history must be examined for evidence of plaintiff's intent regarding the non-phosphate Claims being dropped from the '129 patent and the food acid range being narrowed. See Clement, 131 F.3d at 1469. The prosecution history may contain objective evidence from which plaintiff's intent may be inferred. "'[T]he court may draw inferences from changes in claim scope when other reliable evidence of the patentee's intent is not available,' Ball, 729 F.2d at 1436. Deliberately cancelling or amending a claim in an effort to overcome a reference strongly suggests that the applicant admits that the scope of the claim before the cancellation or amendment is unpatentable, but it is not dispositive because other evidence in the prosecution history may indicate the contrary." Clement, 131 F.3d at 1469.

Defendant contends that the prosecution history is the only evidence that may be considered. The case law is not clear as to that issue. Clement indicates that the prosecution history is the primary source of evidence. See id. at 1469 ("To determine whether an applicant surrendered particular subject matter, we look to the prosecution history for arguments and changes to the claims made in an effort to overcome a prior art rejection."); Hester, 142 F.3d at 1480 (same); Datascope, 2001 WL 1045524 at *5. Cases also indicate that the public and competitors should be able to rely upon the prosecution history in determining what may have been preserved. See Vectra Fitness, Inc. v. TNWK Corp., 162 F.3d 1379, 1384 (Fed. Cir. 1998), cert.

denied, 526 U.S. 1160 (1999); Hester, 142 F.3d at 1481; Mentor, 998 F.2d at 996; Datascope, 2001 WL 1045524 at *8. On the other hand, the cases refer to possible factual disputes regarding recapture. See Pannu, 258 F.3d at 1370; Hester, 142 F.3d at 1484; Mentor, 998 F.2d at 994; Clement, 131 F.3d at 1469; Datascope, 2001 WL 1045524 at *5; Minuteman, 1997 WL 370204 at *6. Some of these cases may simply refer to the possibility that more than one reasonable inference may be drawn from the prosecution history, not necessarily the possibility of submitting evidence from outside the prosecution history. Pannu, 258 F.3d at 1370, though, refers to reviewing district court findings for substantial evidence, which could be a reference to possible evidence outside the prosecution history.

In Hewlett-Packard, the court considered evidence outside the prosecution history in determining whether there was an error permitting reissue, in particular whether the error was without deceptive intent. In that case, the court relied on notebooks of the patent agent that were presented at trial, but not part of the prosecution history. These notebooks conclusively proved the falsity of representations in the patent agent's affidavits which were a part of the prosecution history that was necessary to show an error had occurred. See Hewlett-Packard, 882 F.2d at 1561-62, 1566. These notebooks were also pertinent to possible inequitable conduct that occurred. See id. at 1561-63. Hewlett-Packard's consideration of the outside evidence is consistent with it being the Patent Office's general practice to accept representations of a lack of deceptive intent without conducting an independent

- 8 -

investigation of possible fraud or inequitable conduct. See 56
Fed. Reg. 37321, 37323 (Aug. 6, 1991). Issues as to fraud or
inequitable conduct are instead considered by the courts.
Plaintiff's current declaration is different. It is not an
attempt by a nonparty to the reissue proceedings in which the
nonparty tries to undermine representations that were left
uninvestigated at the time the patent issued.[4] Instead,
plaintiff's current declaration is an attempt by the applicant
herself to bolster representations as to error and lack of
deceptive intent that the applicant could have presented at the
time of reissue. See 37 C.F.R. § 1.175. Allowing plaintiff to
proceed in this manner would undermine the goal of having a
prosecution history that can be relied upon by the public. See
Vectra, 162 F.3d at 1384; Hester, 142 F.3d at 1481; Mentor,
998 F.2d at 996; Datascope, 2001 WL 1045524 at *8. No case
involving recapture error has been cited or found which relies on
a non-prosecution-history declaration or affidavit that goes to
the type of issues contained in plaintiff's current declarations.

Here, plaintiff has submitted her own current declarations
which contain statements regarding plaintiff's state of mind
during the prosecution of the patents. In a prior ruling
permitting defendant to file a successive summary judgment motion
raising recapture, it was expressly stated that, to the extent
either party relied on evidence outside the prosecution history,

---

[4]Defendant does not attempt to submit any evidence from
outside the prosecution history that might raise a question as to
any representation contained in the various declarations of
plaintiff that are contained in the prosecution history.

that party should cite case law supporting that such evidence may appropriately be considered.  Kim v. ConAgra Foods, Inc., 2003 WL 22669035 *5 n.3 (N.D. Ill. Nov. 10, 2003) ("ConAgra III"). Plaintiff has presented no argument nor case law supporting that it is appropriate to consider such evidence.  Therefore, plaintiff has waived the opportunity to present such evidence. Plaintiff's current declarations will not be considered to the extent they attempt to present evidence that is outside the prosecution history.

It is also noted that both parties have provided declarations describing the prosecution history.  To the extent those declarations simply verify the authenticity of the prosecution history documents that are provided, the declarations are accepted.  There is no genuine dispute as to the authenticity of any prosecution history document that is provided.  However, to the extent the declarations attempt to describe or analyze the content of the prosecution history, which occurs more often in plaintiff's declarations than defendant's, it is the prosecution history itself that establishes the prosecution history's contents.  Regarding arguments as to how the prosecution history should be interpreted or facts that can be inferred from it, the court will look to the parties' briefs for their contentions, not the declarations.  Additionally, the parties' Local Rule 56.1 statements of fact, particularly those of plaintiff, are not limited to factual statements and are incomplete.  Both parties recite facts in their briefs which, although supported by citations to the prosecution history, are not facts that are

specifically recited in their Rule 56.1 statements. The court, however, will exercise its discretion to ignore the legal arguments contained in the Rule 56.1 statements and discern the facts of the prosecution history from the presentations contained in the parties Rule 56.1 statements, briefs, and the prosecution history documents that have been provided. <u>See</u> <u>Little v. Cox's Supermarkets</u>, 71 F.3d 637, 641 (7th Cir. 1995); <u>Etheridge v. United States Army</u>, 2002 WL 31248473 *1 (N.D. Ill. Oct. 4, 2002).

Before turning to an examination of the prosecution history, one more consideration will be noted. The Patent Office approved plaintiff's reissue application. Therefore, the claims of the '355 patent are presumed to be valid. Thus, the burden is on defendant to show by clear and convincing evidence that the '355 patent is invalid because it contains improperly recaptured subject matter. <u>See</u> <u>Superior Fireplace Co. v. Majestic Products Co.</u>, 270 F.3d 1358, 1367 (Fed. Cir. 2001); <u>AT & T Corp. v. Microsoft Corp.</u>, 2004 WL 292321 *1 (S.D.N.Y. Feb. 17, 2004); <u>Pannu v. Storz Instruments, Inc.</u>, 106 F. Supp. 2d 1304, 1306 & n.3 (S.D. Fla. 2000), <u>aff'd</u>, 258 F.3d 1366 (Fed. Cir. 2001); <u>United States Filter Corp. v. Ionics, Inc.</u>, 68 F. Supp. 2d 48, 53, 72 (D. Mass. 1999); <u>Minuteman</u>, 1997 WL 370204 at *6. Defendant must point to evidence in the prosecution history that would constitute clear and convincing evidence that plaintiff deliberately surrendered the non-phosphate claims and broader food acid ranges. <u>See</u> <u>Seattle Box</u>, 731 F.2d at 826; <u>AT & T</u>, 2004 WL 292321 at *8.

The prosecution history reveals the following facts. On November 5, 1993, plaintiff filed patent application 08/147,955 (the "'955 Application"), which is entitled "Composition and Process for Controlling Oxidization Rate of Ascorbic Acid and Ice Crystal Growth in Dough." The '955 Application was prepared by an attorney and contained 17 claims. The claims addressed both oxidization and preventing ice crystal growth. No amount of ascorbic acid was specified in any of the claims. Claims 1 through 5 included an "organic acid" (food acid) "from about 0.03 to about .20 parts by weight of flour in the dough." It was unclear if the remaining claims also incorporated this range of organic acid. In an Office Action mailed May 10, 1994, the Patent Examiner denied all the claims finding that plaintiff had to elect to restrict her claims to one of two groups of claims.

In June 1994, plaintiff responded by dropping the ice crystal claims. She elected to proceed on Claims 1-5, 14-15, and 17. She also preserved Claims 6-9 as depending from Claim 1 and added new Claims 18 and 19. Further, plaintiff amended certain claims to be more specific regarding the food acid contained in the claim. None of the claims included a phosphate except Claims 6 through 9.

Claim 1 continued to read:

1. A dough product prepared by the composition of a dough having flour, yeast and water, comprising:
        ascorbic acid; and
        an organic acid in an amount sufficient to control the oxidation rate of said ascorbic acid and from about 0.03 to about 0.20 parts by weight of flour in the dough.

- 12 -

Claim 4, as amended, read:

    4.  The dough product composition as in claim 1 wherein said organic acid is selected from the group consisting of fruit.

Claim 6, as amended, read:

    6.  The dough product composition as in claim 1 further including a phosphate salt added to the dough product, said phosphate salt is selected from a group consisting of dibasic or tribasic phosphates.

In an Office Action mailed August 24, 1994, the Patent Examiner addressed the elected claims and did not allow any of them. Claims 4 and 18 were treated as withdrawn because not limited to fruit acids. (This was a misdescription of amended Claim 4, which had been amended to include only fruit acid.) The remaining claims were found to lack particularity in that they were not specific enough as to the proportion of ingredients in that it was unclear what the 0.03 to 0.20 parts were to be measured against, that is whether it was measured in ratio to the flour or measured in ratio to the flour combined with the other ingredients. The Patent Examiner stated: "The claims should be rephrased to clearly point out the alleged invention." The claims, as written, were also found to be unpatentable as against prior art. Tanaka (U.S. Patent No. 4,296,133) already showed bread doughs containing ascorbic acid with organic acids such as malic. There is no indication that the particular food acid range that had been selected by plaintiff had anything to do with the rejection, other than its indefiniteness. The phosphate limitation of Claims 6-9, as recited, was not considered to be

patentably significant.  Prior art had disclosed the use of phosphate in bread dough and one with ordinary skill in the art would have recognized combining that teaching with Tanaka. "Features variously recited in the different claims are considered obvious limitations or control limitations well within the determination of the ordinary worker in the art."

On September 19, 1994, plaintiff submitted a continuation in part application, No. 08/308617, entitled "Method of Preparing Bromate Replacer" (the "'617 Application").  At this point, plaintiff was no longer represented by an attorney.  With the '617 Application, plaintiff also submitted a document entitled "Preliminary Amendment," which contained arguments as to why her invention was not invalid for obviousness.  She states in the Preliminary Amendment that "[i]n response to the Official Action mailed August 24, 1994, applicant has amended the specification (including the claims and abstract)."  In the preferred embodiment section, plaintiff added:  "Percentages are baker's formula percentages, that is, parts of weight per 100 parts flour."  In the Preliminary Amendment, plaintiff argued the prior art was distinguishable because it used ascorbic acid, food acid, and/or phosphate for other purposes (as additives to improve quality or shelf life or as an emulsifier), whereas her invention used them as an oxidizing agent to replace potassium bromate.  In paragraph (a), plaintiff specifically refers to food acid slowing down the oxidation of ascorbic acid, without also referring to phosphate being needed.  It is also stated that phosphate, "in an

effective amount," has been found to enhance the complexing power of the food acid.

Initially, the Preliminary Amendment was separately considered by the Patent Examiner and construed as a response to the August 1994 Office Action. On April 24, 1995, the Patent Examiner mailed an Office Action which disallowed the claims of the amended '995 Application for essentially the same reasons as stated in the August Office Action, but explained in greater detail and with responses to arguments in the Preliminary Amendment. After recognizing that the Preliminary Amendment had been submitted along with an application containing newly stated claims, the Patent Examiner "vacated" the April 1995 Office Action and expressly stated that plaintiff did not need to respond to it.

The '617 Application contained 10 claims. The claims were numbered 1-10, but the Patent Examiner initially renumbered them as 20-29 since they continued after Claims 1-19 in the '995 Application. Plaintiff referred to two categories of claims, Potassium Bromate Replacer ("PBR") I and II. PBR II was differentiated in that it contained phosphate. Claims 23-26 were the PBR I claims.

Claim 20 of the '617 Application read:

20. A method of preparing potassium bromate replacer comprising an ascorbic acid composition in an effective amount to replace an oxidizing agent of potassium bromate, said ascorbic acid composition comprising:
(a) about 15 to 250 ppm ascorbic acid by weight of flour,
(b) about 0.02 to 0.15 parts food acid per 100 parts flour, and

(c) about 0.15 to 0.40 parts phosphate per
100 parts flour.

Claim 23 of the '617 Application read:

23. The method of claim 20, wherein the
potassium bromate replacer comprises the ascorbic
acid and the food acid.

Defendant contends that Claim 23 (and thus dependent
Claims 24-26) also contain phosphate because they depend on
Claim 20. Claim 23, however, states that it comprises only
ascorbic acid and food acid. It incorporates all elements of
Claim 20 except the phosphate limitation, that is Claim 23
incorporates the ascorbic acid and food acid ranges. Besides
such a reading being consistent with the plain language of
Claim 23, such a reading is consistent with the '617
Application's continued reference to PBR I and the arguments
contained in the Preliminary Amendment document.

On September 19, 1995, after recognizing that the '617
Application had been submitted with the Preliminary Amendment and
discussing with plaintiff that the April 1995 Office Action was
being vacated and the claims renumbered to 20-29, the Patent
Examiner mailed a Notice of Allowance. The Patent Examiner made
his own amendments to the '617 Application, which he states were
authorized by plaintiff in a September 13, 1995 telephone
interview. The most important amendment, for present purposes,
is that Claims 23-29 were cancelled by the Patent Examiner, which
included all the PBR I (non-phosphate) claims. Also, two words
were changed in the specification. Additionally, in Claim 20,

"method of preparing" was deleted and composition was inserted after replacer. "Comprising"[5] at the end of the introductory phrase was replaced with "consisting essentially of."

The Patent Examiner's stated reasons for allowance were, in their entirety, as follows:

> None of the prior art of record teaches or suggests either an ascorbic composition consisting essentially of the specific components, ascorbic acid, a food acid and a phosphate in a specific amount or that such ascorbic acid composition would be effective as a slow-acting oxidizing agent so that it would effectively replace a slow-acting oxidizing agent such as potassium bromate, because ascorbic acid had been known as a fast-acting oxidizing agent.

On April 23, 1996, the '129 Patent issued. It contained Claims 1-3, which corresponded with Claims 20-22 of the '617 Application. All three claims contained phosphate. The summary of the invention still stated "[t]he potassium bromate replacer essentially comprises ascorbic acid, food acid, and/or phosphate." Ascorbic acid and food acid alone are still described as being a slow acting oxidant, with the phosphate being something that has "an additional benefit," such as it "enhances [the] complexing power of the food acid." The preferred embodiment still refers to both PBR I and PBR II, with the former recommended for conventional dough process and the latter for continuously mixed and frozen dough. The detailed description includes a statement that "[f]ood acid ranging from about 0.015 to 0.20 parts, preferably about 0.02 to 0.15 parts

---

[5]In the '129 Patent as issued, "comprising" was not deleted.

per 100 parts flour is added to a yeast-leavened product mix formula."

Less than three weeks after the '129 patent issued, plaintiff submitted reissue application 08/666,736 (the "Reissue Application"). Plaintiff was represented by an attorney at this point, though subsequent submissions indicate some of the submitted documents were prepared by plaintiff herself. The reasons for the error stated on the Reissue Application declaration of plaintiff were:

> The defects [sic] of the original patent is that the applicant's potassium bromate replacer I is not covered in the claims, even though potassium bromate replacer I is given in Example I (page 14, line 16) and is repeatedly discussed in the specification (page 15, line 1).
> The error arose by cancelling claim number 23 that is potassium bromate replacer I. Claims 23 through 29 are cancelled by Examiner, describing that claims 20 through 22 infer claims 23 through 29 during our telephone conversation on 09/13/95 and thus, it should not be repeated. The applicant's error was that the applicant never doubted Examiner's explanation.
> Upon discussion with litigation attorney regarding Dawn Food Products, Inc., the applicant found that the applicant's potassium bromate replacer I is not covered in the claims.

Plaintiff also submitted documents entitled Request for Reissue Application and Preliminary Amendment. In the Request, it is stated that plaintiff filed her prior application

> pro se and erred in her attempt to claim various embodiments of the present invention. Applicant's errors were compounded by a misunderstanding of the Examiner's statements during a conversation. It is evident that the applicant is entitled to a broader scope of claim protection . . . .

The Preliminary Amendment proposed amending '129 Patent

Claim 1 and adding Claims 4-10.  The proposed amendment to

Claim 1, which is also incorporated in all other claims,

contained changes to the ascorbic acid, food acid, and phosphate

ranges.  The ascorbic acid range was to change from "15 to

250 ppm" to "10 to 300 ppm."  The food acid range was to change

from "0.02 to 0.15 parts" to "0.015 to 0.2 parts."  The

Preliminary Amendment contains a "Remarks" section which includes

the following:

> Applicant filed the application for U.S.
> Patent No. 5,510,129 pro se and did not fully
> understand the scope of coverage of the claims.
> Applicant attempted to claim both the Potassium
> Bromate Replacer I (having ascorbic acid and food
> acid) and the Potassium Bromate Replacer II
> (having ascorbic acid, food acid, and phosphate)
> as described in the application and specifically
> at column 6, lines 53-56.  However, instead of
> writing independent claims, the claims were
> improperly set forth by way of one independent
> claim and a series of dependent claim.  Upon
> speaking with the Examiner, Applicant failed to
> understand what the Examiner was stating with
> reference to the claim, and mistakenly believed
> that the Examiner stated that both embodiments I
> and II were covered by Claim 1.  Further,
> Applicant unnecessarily claimed smaller ranges
> than necessary in the Claims, than those
> described throughout the specification.
> It is evident that the pro se Applicant set
> forth claims that are too narrow, and that
> Applicant is entitled to a broader scope of
> protection for Applicant's novel and unobvious
> invention.  The Examiner's Statement of Reasons
> for Allowance indicated that "none of the prior
> art of record teaches or suggests either an
> ascorbic composition consisting essentially of
> the specific components, ascorbic acid, a food
> acid and a phosphate in a specific amount or that
> such ascorbic acid composition would be effective
> as a slow-acting oxidizing agent so that it would
> effectively replace a slow-acting oxidizing agent
> such as potassium bromate, because ascorbic acid
> had been known as a fast-acting oxidizing agent."

Accordingly, Claim 1 has been amended to broaden the claimed ranges of the various claimed elements. Further, new claims 4-10 have been added to Claim the broader Potassium Bromate Replacer I, as well as various key aspects of Applicant's invention.

In an Office Action mailed March 26, 1997, the Patent Examiner denied the Reissue Application. The Patent Examiner noted procedural inadequacies such as a failure to put amendments in proper form. He also noted a failure to sufficiently set forth the error in the declaration. Substantively, the Patent Examiner rejected the claims as being an improper attempt to recapture subject matter that had been deliberately cancelled. The Patent Examiner noted that claims without phosphates had previously been cancelled in light of prior art that included only ascorbic acid and certain food acids. The Patent Examiner did not acknowledge that plaintiff's claims included specified amounts of ascorbic acid and food acid.

Again proceeding without the aid of counsel, on July 22, 1997, plaintiff submitted documents entitled "Request for Reissue Application" and "First Amendment." She also submitted the first page of a June 26, 1997 letter that her attorney had sent to her and apparently some other documents as well.[6] In the June 1997

---

[6]The Request for Reissue Application lists supporting documents that purportedly are being submitted. In that document, plaintiff notes that the June 1997 letter is being submitted to show that her response is late because her attorney did not contact her until the date a response was due. She paid the fee that was required because of the late submission. It is unclear if Exhibits 3 and/or 4 of plaintiff's December 29, 2002 declaration [Docket Entry 114] were part of plaintiff's July 22, 1997 submission.

letter, the attorney asked if plaintiff wanted him to prepare a response to the March 1997 Office Action. Defendant points to the following statement in the letter from the attorney. "We note that most of the objections and/or rejections arose as a direct result of your unwillingness to let us prepare all of the reissue documents, as stated in our follow-up letter of May 17, 1996."[7]

The First Amendment corrected the form problems with the amendments. Plaintiff also provided further detail as to the claimed error, including as to her September 13, 1995 conversation with the Patent Examiner. She also included details as to sources of the reissue claims in the '617 application.

In an Office Action mailed March 5, 1998, the Patent Examiner again rejected the reissue claims. He rejected Claims 1, 4, and 7-10 for failing to particularly point out and distinctly claim the subject matter, pointing to particular language that was indefinite. Claims 1, 2, and 4-10 were rejected as unpatentable over Tanaka in that Tanaka disclosed a dough composition containing 30 ppm ascorbic acid and 60 ppm malic or tartaric acid and a phosphate. Claims 5-9 were rejected as anticipated by prior art. It was stated that the ascorbic acid and citric acid in prior art would inherently function in

---

[7]It is noted that some of the present summary judgment pleadings appear to have been drafted by plaintiff herself. While plaintiff was proceeding pro se, she was frequently admonished to retain counsel. See ConAgra II, 2003 WL 21222266 at *1 n.4. Now that she is represented by counsel, plaintiff is admonished to permit her attorneys to perform the legal work. Should this case go to trial, it is the attorneys that will represent her in court. At trial, plaintiff will not be permitted to present any arguments or evidence or question witnesses other than through the attorneys that represent her.

the same manner as those claims. Claim 1 and other Claims were also rejected for being unpatentable over other prior art. The reissue declaration was found to be deficient for failing to state that all errors were without deceptive intent. The arguments contained in plaintiff's July 22, 1997 submission were found to be moot in light of the above grounds of rejection.

On May 8, 1998, plaintiff, still proceeding pro se, submitted a new declaration on the standard form and a document entitled "Supplemental Reissue Declaration." She apparently filed other documents as well, but they have not been provided by either party. Plaintiff added an eleventh claim.

On July 14, 1998, the Patent Examiner mailed an Office Action rejecting all 11 claims. This was denoted as a "final" action, which limited the time for further response. Claim 1 was found to be defective as to the form of amendment. Claims were rejected for being indefinite and unpatentable, obvious, and/or anticipated in light of prior art. The declaration was found to be deficient for the same reasons as previously stated.

On July 23, 1998, plaintiff faxed a response in which she argued that her claims were not unpatentable in light of the prior art. On August 14, 1998, she submitted a document entitled "Amendment Under Rule 116," which contained a number of attachments including a "Supplemental Reissue Declaration." She again argued the claims had patentable merit. These contentions were summarily rejected in an Advisory Action dated August 25, 1998.

On October 9 and 15, 1998, plaintiff faxed additional documents entitled "Amendment Under Rule 116." She requested that Claims 1-2 and 4-11 be cancelled and replaced with amended Claims 1-2 and 4-10. She submitted two more "Supplemental Reissue Declarations" as well. The amended versions of the claims still contained the "0.015 to 0.2 parts food acid" range and non-phosphate PBR I claims.

On November 3, 1998, the Patent Examiner mailed a Notice of Allowability. The Patent Examiner does not specifically address the issue of error. The Patent Examiner states:

> 1. The following is an examiner's statement of reasons for allowance: The primary reason for allowance is a composition, which has use as a potassium bromate replacer when combined with flour, consisting essentially of 0.001 to 0.03 parts ascorbic acid per 100 parts by weight flour and 0.015 to 0.2 parts food acid per 100 parts by weight flour.

The reissued '355 Patent issued on October 26, 1999.

The inclusion of PBR I (non-phosphate) claims in the reissued '355 patent will be considered first. In large part, defendant's argument regarding such claims relies on a fact that is unsupported by the prosecution history. Defendant contends that plaintiff deliberately withdrew the PBR I claims when she submitted the '617 application without such claims. As is discussed above, that contention is based on a misreading of Claim 23 of the '617 application. The prosecution history only supports that the PBR I claims were amended out of the '129 Patent by action of the Patent Examiner. It is true that plaintiff, who was then acting without the advice of counsel,

acquiesced in the removal of the PBR I claims (23-26).
Acquiescence in the Patent Examiner's act of amendment is not the
same sort of deliberate act as is an applicant's own act of
withdrawing or amending claims after rejection by the Patent
Office.  See Haliczer, 356 F.2d at 545.  In any event, the
prosecution history supports that plaintiff's acquiescence in the
removal of Claims 23-26 was based on a misunderstanding during
the telephone conversation in which plaintiff acquiesced in the
removal.  The declarations of plaintiff that are in the
prosecution history only support that plaintiff's understanding
was that the remaining claims still included PBR I claims.  That
evidence is consistent with plaintiff's prior arguments in favor
of her invention and is even consistent with the fact that the
'129 Patent, as issued, still included references to PBR I
formulas, though not in the claims themselves.  Defendant does
not point to evidence in the prosecution history that would be
clear and convincing evidence to the contrary.  The inclusion of
PBR I claims in the reissued '355 Patent did not violate the
recapture rule.  Plaintiff is entitled to summary judgment
dismissing this aspect of defendant's recapture defense.

        The change in food acid range is in a different posture,
but there is still no clear and convincing evidence that
plaintiff deliberately surrendered the outer ends of the food
acid range that was subsequently recaptured.  The selection of a
food acid range was done by plaintiff, not by the Patent
Examiner.  The original '955 application and the June 1994
amendment contained a food acid range of .03 to .20.  The Patent

Examiner did not indicate that this particular range was obvious in light of the prior art. Instead, the Patent Examiner indicated that the use of food acid and ascorbic acid in general was disclosed by the prior art and that the particular range (as well as other elements of the claims) was indefinite in that it was unclear if it was measured solely in ratio to flour. Plaintiff cured the latter error by specifying that the measurement was based on "baker's formula percentages" and measured as against flour only, "parts of weight per 100 parts flour." Without explanation, plaintiff stated a new numerical range of .02 to .15. The absolute numbers were changed, but not necessarily the specific range in that the prior range was indefinite by failing to precisely define how it was measured. Since the prior use of ".03" and ".20" were imprecisely stated as a measurement, it cannot be found that plaintiff thereby surrendered the range between .20 and .15 by providing a more precise definition of the numbers being used. And, on the lower end (viewed as an absolute number), plaintiff broadened the numerical range by dropping from .03 to .02. Defendant, however, points to the inclusion of a possible broader range of .015 to .20 in the detailed description as showing plaintiff intentionally chose the narrower range of .02 to .15 in the claim itself in order to distinguish her invention from the prior art. While the inclusion of a more precise definition of the range was one thing done to distinguish the prior art, the particular range that was chosen was not necessarily chosen for that purpose. The Patent Examiner had not indicated whether the .03 or .20 numbers

were appropriate or inappropriate, just not precisely enough described. Thus, based on the Patent Examiner's prior rejection, it cannot be inferred that plaintiff chose the particular ends of the range to distinguish from the prior art. Further the range for the food acids used in the pertinent prior art (Tanaka) had been .0005 to .006. Plaintiff's lower end choice of .015 or .020 are both a significant difference from .006. It can not be inferred that plaintiff's choice of .020 instead of .015 was because plaintiff was surrendering the difference between the two out of fear .015 would be found to be obvious while .020 would not. Defendant does not point to any prior art with a higher range that was being distinguished by the choice of .15 instead of .20. Moreover, it cannot be found that any of this evidence is clear and convincing evidence that plaintiff intentionally surrendered .015 as the lower end of the range or .20 as the upper end of the range. Neither is there clear and convincing evidence that plaintiff essentially admitted the far ends of the range were not patentable. Plaintiff is entitled to summary judgment dismissing defendant's recapture defense in its entirety.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment [109] is denied. Plaintiff's motion for partial summary judgment [110] is granted. Defendant's affirmative defense based on the recapture rule is dismissed. In open court on May 5, 2004 at 11:00 a.m., the parties shall present an

original and one copy of a final pretrial order in full
compliance with Local Rule 16.1 and Local Rule Form 16.1.1.

ENTER:

_____
UNITED STATES DISTRICT JUDGE

DATED: MARCH 25, 2004